Thank you, Your Honor. May it please the Court, my name is George Farah and I represent the appellants and I'm here along with my colleague Rebecca Chang. We are here today to respectfully request that the Fourth Circuit reverse the District Court's grant of defendants' motion to dismiss our RICO claim or, and the alternative, to reverse the District Court's denial of our motion to amend. Now I'll be focusing my presentation on the dismissal of the RICO claim because we believe that is the key judicial error and reversal of that decision will moot any need to consider the proposed amendments. Now our RICO claim alleges that defendants systematically lied to local governments around the country about transaction fees in order to charge extraordinarily high prices for a certain kind of collect call made by prison inmates known as a single call. And these costs were largely borne by the family members of inmates, many of whom struggled to make ends meet. And the District Court dismissed that RICO claim on two causation grounds. First, it held that plaintiff's injuries were to the fault of local governments. And second, it held that the causation allegations are too speculative. Both of those conclusions reached by the District Court were incorrect and the District Court decision should be dismissed. And there are important legal issues at stake. If our appeal is denied, other parties in this circuit who were directly overcharged by defendants when they made misrepresentations to, to third parties... Doesn't your theory of liability rest on what the government would have done if they would have known the truth about the transaction fees? That is correct. How is it not speculative? For multiple reasons. First of all, Your Honor, we have actual statements from defendants, former executives, who have experience negotiating the contracts with these governments. For example, Mr. Brian Gunter, a whistleblower, is the former director of sales of Securus. He managed accounts with 650 local governments around the country and personally negotiated hundreds of those contracts. And he personally made the misrepresentations at the core of our case. And he testified in a sworn declaration that, that absent defendants' misrepresentations, county governments would have insisted on lower single call prices. He further said that the vast... How does he know what the county governments would have done? How does Mr. Gunter know? Because he made the misrepresentations. He said the vast majority  he and his sales team neutralized those concerns by falsely informing those governments that the transaction fees were the overwhelming amount of the charge. And he said that those – his specific words were that those misrepresentations were, quote, effective in persuading the local governments to accept the inflated single call charges. And we also have similar statements from a former executive of GTL. And there's other evidence, Your Honor, to support the lower single call prices. And many of our allegations address how local governments behaved when they weren't subjected to fraudulent misrepresentations regarding transaction fees. For example, the defendants' GTL and Securus didn't only sell single calls. They also sold a call that charged a permanent rate. Local governments negotiated that permanent rate with the defendants. And invariably, they negotiated a permanent rate that was a fraction of 10 to 20 percent the price of a single call. And the reason for this huge price discrepancy, even though the calls were the same length and time, is that local governments weren't subject to fraudulent misrepresentations regarding transaction fees when they were negotiating with defendants regarding permanent rates. That's why the permanent rate in 2017 averaged $1.87, but the single calls are $14.99 per call. And finally, Your Honor, to address the speculation point that you raised, in 2018, the defendants actually, the local governments exerted sufficient pressure that eventually the defendants phased out single calls. After nine years of these single calls, started in 2010 and ended in 2018, because governments were complaining so excessively about single calls, eventually after nine years, they abandoned those pricing. Of course, our allegation is absent defendants' misrepresentation. They never would have been able to charge these prices to begin with. But we have powerful allegations, especially at the complaint level, that show it's extremely plausible that our causation theory has weight. Counsel, I don't know that this has anything to do with the issue that is up on appeal, but I was just curious about this and I didn't find an explanation in the record. So what is the incentive for a person like your client to use the single call option versus the account based option, which is so much lower in cost? So what happens, Your Honor, is someone's son, daughter, or relative is put into jail for the day and before anything happens, they're transferred to another institution. They make a phone call, a collect phone call to their loved one. The loved one picks up the phone and what it says is, if you'd like to continue this call with your loved one, push button one. If not, if you don't want to be charged $14.99 or $9.99 depending on where the charge is, please push two, hang up the phone, and set up another account. So you literally have to set up another account by getting off the phone and hope that your loved one finds a way to call you at another time. People set up those calls once they've established a relationship with their loved one in an incarcerated institution long term and that's why folks are trapped into positions of having to pay these inflated and absurdly high prices for a single call with a loved one. I will continue addressing... Can I ask you a question about this? As I understand it from the Slay's Restoration opinion, one of the reasons for the direct relationship requirement is without it, courts would have to engage in the complicated task of apportioning damages. And here, you're saying the county or the local government is harmed and your clients are harmed, right? So how is that going to be apportioned? Your Honor, first of all, there's multiple RICO cases where there's a single RICO scheme that directly injures two different parties in two different ways and causes two different sets of damages. We cite to the Mid-Atlantic Telecom case in the Fourth Circuit, the Harmony case in the Ninth Circuit. The what case? The Mid-Atlantic Telecom case in the Fourth Circuit and the Harmony case in the Ninth Circuit. So that's an unusual fact pattern and the courts consistently hold that both parties, if directly injured and separate damages are caused, can pursue their claims. Here, to answer your specific question, the determination of the price that consumers must pay for the single call is a separate and different decision as to how much of that revenue is allocated to local governments. They are independent analyses. In other words, if we brought our claim, we would determine in the but-for world how much lower would that $14.99 call be and that would be our damages. The government's damages would then be, of that lowered amount, how much of it is allocated. So they are independent analyses. They are separate damages. Tomorrow, county governments could bring their own RICO claim and their damages calculation would not affect ours. There would be no reason for an offset. Moving on to the issue of derivative injury, I will address that particular issue. Now, courts borrow RICO claims that are predicated on injuries that are derivative of another party. And during this litigation, the defendants have switched which injury they claim that the plaintiff's injuries are derivative of. In their motion to dismiss, the defendants argued that the plaintiff's injuries are derivative of the actual economic harm to governments of receiving lower commissions. But in opposing our motion to amend it, and again in opposing this appeal, they have shifted course and primarily argued that the plaintiff's injuries are derivative of the intangible abstract harm of being fraudulently induced into contract. I want to briefly first address how it is factually impossible for plaintiff's injuries stemming from the inflation of single call prices to be derivative of governments receiving lower commissions and then address how it is legally impossible for plaintiff's injuries to be derivative of the abstract harm of being fraudulently induced into contract. And turning to the actual economic harm, the only tangible injury that local governments suffered as a consequence of the defendant's RICO scheme is they received lower commissions. And if our plaintiffs were taxpayers, alleging that the receipt of these lower commissions resulted in more potholes in the streets or worse schools, their claims would be appropriately dismissed as derivative. But we're not representing taxpayers. We're representing consumers claiming that the single call prices should have been higher. And there's no way that the single call prices being higher, the damages from that amount, is derivative of governments' injuries receiving lower commissions. First argument, governments never passed on any of their loss of commission to plaintiffs of some sort of injury, nor are plaintiff's injuries even conditional on governments being injured at all. In fact, they're entirely separate injuries. Tomorrow, the defendants could eliminate the government's injury without that having any effect on the plaintiffs. Right now, on a call that charges consumers $14.99, the defendants pay local governments a commission of $1.60. Tomorrow, they could raise that to $10 without changing the price. That would eliminate the injury to the government but have zero effect on the harm to consumers. They would still be charged $14.99 for each call. It's not possible for plaintiff's injuries to be derivative of a government injury if the elimination of that injury has no bearing on the plaintiff's injury. And the second key point I'd like to make on derivative injury is plaintiffs purchased the single calls directly from the defendants. The defendants directly overcharged the plaintiffs. The defendants directly inflicted the injury on the plaintiffs. So it's not possible for some other third party to be the plaintiff's injury to be derivative of that injury. But under your scenario, though, if the government's commissions were increased, that would suggest that this misrepresentation regarding these fixed transaction fees would no longer be true, right? Because they're, in fact, modifying the scheme to allow for a higher commission. Yes, but what it indicates, Your Honor, is that it's not possible for the plaintiff's injury to be derivative of the... I don't know that the plaintiffs would have an injury in that scenario because you no longer have the misrepresentation about the transaction fees being non-negotiable because the commission structure has changed under your example. If the... You're saying if the defendants, if I understand it correctly, Your Honor, if the defendants were to increase the commission, this would happen in the future? Yes, if this were to happen in the but-for world. But I lay that example out to show that they're not derivative of the other. I mean, we could flip it around and say, imagine the defendants reduced the price of a single call from $14.99 to $0.50. The plaintiffs are no longer suffering an injury, but the government is now receiving a higher injury from commissions and that they're receiving lower commissions. The point being is that they're delinked. This is not a classic derivative injury fact pattern where person A's injury is conditional on person B having been injured first. And speaking of the chronology, Your Honor, plaintiffs are injured before the governments even receive their commission. The defendants charge the plaintiffs $14.99 or $9.99 depending on the medium. And then and only then do they pay commissions to the local governments. How can the plaintiff's injury be conditional on the government receiving lower commissions if the plaintiffs are ones being charged first? So what this fact pattern shows is that there are two injuries, two injuries, direct injuries. And again, the Mid-Atlantic Telecom case from the Fourth Circuit, the Harmony case from the Ninth Circuit hold unequivocally that when there are two distinctly injured parties that can that both have been injured of their own sets of damages, they're entitled to pursue their own RICO claims. Defendants, in response to this kind of overwhelming evidence that it's not factually possible for the plaintiff's injuries to be derivative of the government's injury, and they try to come up with some sort of other government injury from which plaintiff's injury could derive. And what the defendants argue is that governments were injured in the abstract and tangible way of being fraudulently induced into contract. And they argue that because the governments received the misrepresentations and were fraudulently induced into a contract before the plaintiffs were charged for single calls, the plaintiff's injuries were not necessarily derivative. And the district court accepted that argument. That is the district court's acceptance of that argument. The district court at a hearing said that plaintiff's injuries were derivative because, quote, the chain of events starts with whatever statements were made to the government officials when they were in negotiations with the defendants, end quote. There are three reasons why that's wrong. I'll briefly address one of them because of the limited time I have. But Supreme Court precedent has unequivocally held that a plaintiff may pursue a RICO claim against a defendant that was fraudulently induced into a contract. In the Bridge case from 2008, the defendants lied to the county government and induced the county government to enter into a contract to sell the plaintiff a tax lien. The plaintiff wanted to buy the same tax lien, so it filed a RICO claim. If defendant's argument had weight, the argument the district court adopted had weight, the Supreme Court would have said, well, I'm sorry, plaintiff. You don't have a viable RICO claim because the government was fraudulently induced into a contract. That was a contractual injury. Those were improper contractual terms. And your injury follows from and stems from that government injury. So you have a derivative injury. Your case is rejected. But that's not what the Supreme Court held. It held the precise opposite. It held that plaintiffs had a viable RICO claim precisely because the government had first been fraudulently induced and that plaintiff's subsequent injuries were direct, not derivative. And it squarely rejected the notion that a party's claims could be derivative merely because the government had been induced earlier in the causal chain. The Supreme Court said specifically that a party can bring a RICO claim even if it wasn't the direct recipient of the fraudulent misrepresentation. And I'll make one last point addressing this issue with the 58 seconds I have, which is the argument that plaintiff's claims, the injuries, could somehow be derivative of the government injury is also squarely inconsistent with the RICO statute itself. The RICO statute says that the only injuries that count as a RICO injury are injuries to business or property. And the mere fact of being induced or fraudulently induced to a contract itself does not constitute a viable RICO injury. The governments didn't suffer injury the moment they signed those contracts. They suffered injury when they received those lower commissions. And those commission payments followed only after the plaintiffs first purchased those products and the plaintiffs were first injured. So I will reserve my time. Thank you. All right. Thank you, counsel. Mr. Sherr. Good morning. Jason Arsher, Morgan Lewis. We're Secures Technologies, and I have the privilege of arguing today also for Applebee's, Global Tellink, and 3C Interactive. May it be a pleasure, Mr. Sherr. Your court properly dismissed appellants' RICO claims because the connection between the alleged misrepresentations to the local agencies responsible for operating correctional facilities and the amounts paid by appellants is too remote to establish proximate causation under RICO. No one is disputing that appellants paid money for ICS services. That's what enables but-for causation. Had appellants not paid for the services at issue, there'd be no claimed injury at all. But but-for causation, of course, is not enough. That's the lesson of Holmes and the other Supreme Court precedents cited repeatedly in our briefing. The proximate causation inquiry is a legal gatekeeping function. In the words of the litigation that otherwise would be foisted on the courts, claims may proceed only when a plaintiff's theory of causation is that the alleged harm flows directly and necessarily and without interruption from the conduct challenged by that particular claim. Appellants directly paid appellees for the phone calls they made and so they were directly harmed by those high prices for the single call. The district court addressed that argument and concluded that the relationship between the harm challenged in the Sherman Act claim, the price fixing, was sufficiently closely related to the payment of that fixed price to enable the antitrust claim to proceed. However, the RICO count challenges very different conduct. The RICO count challenges misrepresentations alleged to have been made to the local agency officers who are responsible for overseeing and operating these correctional facilities. And there, there are too many links in the causal chain. The claimed claimants many times through their briefing and during oral argument focus on the derivative or non-derivative nature of the claimed injury, but they pay short shrift to the contingent nature of their injury, and we'll get into that in more detail momentarily. If there are intervening causes or too many links or a contingency, then the injury is too remote to support proximate causation, and that's the sort of questions and uncertain inquiries of apportionment, as Judge Eagles questioned. How does one determine how much the rates would have changed in any given circumstance in a but-for world? How much would end-user prices have been lower, if at all? How much would commissions have been higher, and what other terms may or would have changed? These are the sorts of questions that the court requests that we not permit plaintiffs to foist upon the court because they're too complicated for our RICO calls of action. In Holmes, the court in footnote 20, when adopting the associated general contractors factors for RICO, pulling them over from the Clayton Act, even notes that because there can be no black-letter rule, because these are potentially complicated questions, our use of the term direct should merely be understood as a reference to the proximate cause inquiry born of these stated concerns. Which is often evaluated at summary judgment, not 12B6, like here, right? I mean, proximate cause, I'm not, it seems difficult to me for your position to say that these folks weren't harmed, which is what you say in your brief. You say the contracting government could sue to recover damages flowing from the alleged harm, but they didn't pay. It's the consumers who paid. Are you saying that if the government came in and sued, that they could recover on behalf of these consumers the entire amount that was overpaid by the consumers? I didn't really understand that argument. Thank you for your question. The appellant's theory is that the injury they claim to have incurred is not, even though they argue it is a distinct injury, it is actually an injury that flows directly from the claimed injury to the local agency responsible for operating the correctional facility. And here's what I mean. It is not just a pass-on theory. Sure, pass-on theory is easy. Somebody pays more and they pass along a higher cost. But here, the appellant's theory of liability is that higher commissions, end-user rates, all other terms of the contract are negotiated together. And that the local agencies have their own interests that they are negotiating for. That they are, as the court earlier today, in connection with the Bolger case, the court questioned counsel about prison officials having to make judgments about how they operate their facilities, and how they allocate their resources, where their priorities are, where they put staffing, where they put their budget, and what it is that they should do. Well, the court needs to recognize here that the single call product is for the relevant period. These claims go back to January 2010. And under the regulatory scheme there, the single call is an add-on. It is a supplemental piece, one small piece, of a much larger contract that governs ICS services generally, outgoing collect calls from incarcerated individuals to the recipients of those calls. And all of the terms, including the end-user prices and the commissions, and the times that would be allotted, and the use of the telecommunications equipment at the facility, all of the, and the duration of the contract, all of it is negotiated together. And the theory is not that as taxpayers there is some sort of mechanism to influence or control those negotiations. Rather, it is that the facilities are operating in dual capacities. They are operating as quasi-private entities, entities that have a direct financial interest in the future cash flows that will be generated by the contract. I don't understand how you are answering my question. My question is, you say in your brief the government could recover for amounts that the appellants overpaid. At least that is what I see you saying at page 40 through 41 of your brief. The government could sue to recover damages flowing from the alleged harm suffered as a result of the alleged misrepresentation. So, if the plaintiff's appellants overpaid, you are saying the government could sue to recover that. And I don't understand how that sucks. They can, Your Honor. The issue is that the reason, according to appellants, the reason that these local agencies negotiate is that they, the local agencies, have their own priorities. Yes, they have a financial interest. Yes, they are going to get a portion of the revenue generated by these contracts. But they also operate in a parent's patriotic capacity. That in addition to the fact that the appellants overpaid, in addition to being commercial or quasi-commercial facility operators, they are governmental entities. The consumers aren't negotiating rates directly. Their theory is that the local agencies demand a fair opportunity to negotiate lower end user rates. So, if the government sued you and said you lied to us and the rates were too high and we want to recover every single nickel paid by the consumers and we want you to pay it to us, you would say, well, if we lied to you, okay, we owe it to you. You wouldn't come in and say, you can't have that money. It's these people who repaid, who paid too much. Well, we're constrained here by the appellant's theory of the case. The appellant's theory is that the local agencies were acting in a parent's patriotic capacity. That it was the governmental interest in having lower rates that lower end user rates were in part motivated their decisions about where their priorities lay. So, whether there should be higher end user rates with higher commissions to serve the facility's budgetary needs or lower end user rates with lower commissions to serve a parent's patriotic interest or other balancing of other contract terms, that's entirely discretionary to the officers who are negotiating those contracts with the local agencies. How do you distinguish the bridge case? Well, the bridge case is a much more direct and simplistic theory of causation. The bridge case involved no discretion on the part of the government and importantly, there was no injury to the government at all. It was a static regime in which there was an intended purpose of taking those customers away from the competitor. So, there was no dispute. Everyone in bridge recognized that the party receiving, in this case the government, the party receiving the representation was not injured. There were no complicated issues of proof. It was straightforward. There was no balancing, no questioning of what the end user rates would have been. How much would it have been? A lot of appellants say that local agencies, had they known the truth, would have lowered end user rates. But by how much? To what extent? Would it have been partially offsetting the out-of-pocket costs? Would it have been all the way? Would they have moved more into commissions? Would they have extended the term or would they have given back equipment that was provided as part of the commission? So, it is not like bridge at all. In fact, there is not a single case cited by appellants in which a private civil RICO plaintiff is permitted to proceed where the government itself entered into a financial contract with the supposed RICO enterprise. So, the same is true with respect to Mid-Atlantic Telecom, which is one of the cases considered by bridge and analogized by Justice Thomas in that opinion. And so, when appellants concede that the local agencies are in fact injured, they establish two things that render their RICO count unenforceable. First, it establishes that the appellant's claimed injury is not the  we all understood that. Appellant's flow of funds concept, that the payment first comes from appellants and then ultimately makes its way to the facilities, ignores that the service does not get provided in the first instance. The invoices do not get issued. There is no service and no contract or activity, but for the prior contracting that sets the rates, the alleged misrepresentations that lead to that negotiation. And as HEMI group acknowledges and this court acknowledges in Slay's Restoration, the tendency of the law is to not go beyond that first step. It applies with full force to proximate inquiries under RICO. It also, upon completion of the contracting, not only does the appellant's claim not get issued, but the local agency is absolutely injured at that point. It need not wait until calls are placed and it doesn't receive part of the revenue stream. As soon as the contracts are signed, the local agency rights are fixed. And this happens all the time with anything that involves future cash flows. Loan agreements, mortgages, sales of receivables or annuities, as soon as the contract is signed, the rights of the parties are fixed and the injured party may sue. And again, these are the same injuries alleged here. They are inextricably linked because it is the parent's patriarchal capacity of the local agency that appellants are relying on. But second and more importantly, the concession that local agencies are injured also establishes the contingent, not just derivative, but contingent nature of the appellant's claimed harm. And that really does end the argument that the RICO claim can't survive if curing the injury to the local agencies would eliminate the claimed injury to the appellants as well. That's the Holmes acknowledgment. But when reading appellants' briefing and listening to the argument, what leaps off the page and what sounds in our ears is this notion that they maintain an injury even if the local agencies collect 100% of the claims. And this is the differential that appellants say exists as a result of misrepresentations. They're so focused on trying to show that their claim isn't derivative that they actually establish the lack of approximate causation link. And here's what I mean. Appellants argue that the injuries to the correctional facilities and to themselves are independent because if you remove one, the other can still persist. If you reduce the end user price to what appellants say are competitive levels, whatever those levels might turn out to be, which would require a complicated navigation of proof issues, then you remove the injury to appellants, but you further harm the correctional facilities. My colleague made that point during his remarks. Conversely, if the local officials insisted on receiving 100% of the alleged overcharge being paid in commissions, and this is Judge Diaz's question, then the injury to the facility would be completely eliminated, but appellants would still have the same alleged injury. They'd still pay the same supposedly inflated price. That's their argument. But what it means is that the amount paid by the appellants can't flow directly from the wrongful conduct challenged in the RICO count, the misrepresentations. They'd have the same injury absent those misrepresentations as they'd have with the misrepresentations. Instead, what it demonstrates is that the alleged injury flows most directly from the contracting decisions made by those local officials based on the factors those officials prioritize. So in a full disclosure world, how much of the... I don't have an understanding of what that would mean. If in fact the governments are getting the full amount of the increase in price, that $14.99, that essentially means that the misrepresentation that the transaction fees are non-negotiable no longer exists because they've negotiated a commission, which necessarily reduces the amount of transaction fees that would otherwise be paid to that third-party service provider that apparently handles the accounts in this instance. So in that case, there's no longer any misrepresentation, period. But that's not this case, I guess, is the point that your colleague is saying. That's not what happened here. Well, but the way they make their point, I appreciate the court's observation, and you're right. There would be, in fact, no injury at all flowing to appellants. But what it reinforces, it doesn't have to be all or nothing. And I'll make this point, and I'm going to ask your colleague on the other side to respond to this. At that point, it's the plaintiff's choice whether or not to pick up the phone and accept the call. That's the price. That's the price. There's no misrepresentation. Certainly, appellants initially brought additional claims that there were misrepresentations that were actionable directly by consumers. Those claims were dismissed, and they're not up on appeal. They're not challenged on appeal. Here, the court is right. The injury would no longer exist. There would be no causation, but there would also be no injury, in fact. But even if it's not 100 percent, even if it's a sliding scale and different local agencies make different decisions about how to allocate the available funds that remain from the transaction fees, then to the extent that even a penny of that doesn't go to lowering the end-user price, if anybody decides to do anything with that money, then it shows that the injury, to that extent, the claimed injury, flows from that decision made by the local agency. It does not flow directly. It does not flow proximately from the alleged misrepresentations. So if this were a case about an exclusive contract, which is what we're talking about, to pick up garbage, and because the defendants conspire and lie to the municipality or county or whoever it is, they get a higher rate, and it's paid by homeowners. The homeowners cannot sit back and watch the judge sue under RICO. That would be your position, because that's exactly the same thing we have here. You're just not talking about jails or prisons. Well, respectfully, the fact pattern differs in an important respect, in that here, the local agencies participate in the revenue stream. Okay. What if they participated in the trash pickup? They get a commission for each pickup. Well, it's an important distinction, because where the local government participates, it becomes important for the local government to balance its budgetary constraints, its operational priorities, and, indeed, its parents' patriotic considerations. Taking at face value of Helen's claim that local governments do consider the end-user prices to the call recipients as one of the... So it's okay to lie to the government in that situation? Not at all, Your Honor. The issue is that the government has every incentive in the event of such misrepresentations to pursue claims for those misrepresentations. It has standing, it has the opportunity, and it has the incentive, both because it has missed out or potentially missed out on its own revenue stream, and, more importantly, because the revenue stream is part of a larger set of priorities that the government has not been able to negotiate. And you'd be fine with the government recovering what the appellants overpaid if the government won? You'd have no problems with that? The appellant's theory is that the governments, in that respect, are acting in a parent's patriotic capacity, that they're acting for the benefit of call recipients, essentially like a third-party beneficiary-type concept. And so if the appellant's theory is that's the... I'm talking about if the government sued you. I understand. And if the government sues on the basis that it has allowed additional higher-than-market end-user prices to be established in a contract, then the government can pursue all remedies available to it for that harm. I'm pretty sure you'd be jumping up and down screaming about that. Well, our case today is not which remedies are available to the government in that circumstance. Our case is whether these plaintiffs, these appellants, may recover for injuries that they acknowledge flow directly not from the misrepresentations, but from the decisions of the intervening actors. All right. Fire away. I'm done. I think I've harassed him enough. Over your time, Mr. Shurer, I'll let you wrap up quickly. Thank you, Your Honor. Actually, I've addressed the court's concerns, and given the time, I'll allow it. Thank you very much. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor.
judges: Albert Diaz, Stephanie D. Thacker, Catherine C. Eagles